## SELIGSON v. GOLDSMITH.
### No. 249.

Circuit Court of Appeals, Second Circuit.
June 26, 1942.

Irwin Isaacs, of New York City, for appellant.

Allan D. Emil, of New York City (George Kossoy, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and FRANK, circuit judges.

L. HAND, Circuit Judge.

This appeal is from an order of the District Court which confirmed a referee's order, directing the respondent, Jack Goldsmith, to deliver to the trustee 145 "black kid plates," the property of the bankrupt, or in place thereof the value of the "plates" found to be $1,812.50. The bankrupt was a corporation dealing in furs in the City of New York; the respondent and one David Grossman were its only shareholders, directors and officers. In the course of its business it shipped to the Novelty Fur Company of Chicago 200 skins, known as "black kid plates," invoiced at $2,500. About two weeks later the consignee returned these skins to another firm, the bankrupt having in the meantime been ousted from its place of business. Goldsmith immediately removed the returned skins from this firm to another firm in New York, and soon thereafter carried them to the home in Long Island of his brother-in-law, Fruitstone, where he put them in the cellar. He did not live with Fruitstone but with his parents in the Borough of Brooklyn, where he had no room to store the skins. His story was that about four or five months after he had left the skins with Fruitstone he was awakened from his sleep one Sunday morning and was told that the Fruitstone house had been robbed; he went there at once and found that most of the skins were gone. Fruitstone told him that he had noticed on that morning that the window leading to the basement had been broken. He did not inform the police or take any other action except to turn over to the trustee 55 skins which the thief had left in the cellar, and which the trustee later sold for $243.80. The referee believed the whole story to be a fabrication; he found that Goldsmith had retained in his custody or

under his control all 200 of the skins except the 55 which he returned, and that their value was the same as that at which they had been consigned to the Novelty Fur Company, $12.50 a skin; and he directed Goldsmith to turn them over, or in the alternative to pay $1,812.50. This alternative can be sustained only on the theory that if he sold the skins, he sold them at the invoice price. Goldsmith appealed on the ground that the evidence does not support the finding that he stole the skins at all; and that even if it did, there was no basis for assuming that if he sold them, he sold them for $12.50, or that he had the proceeds still in his possession at the time of the hearings. The relevant dates are as follows: The skins were returned to the bankrupt not later than January, 1939; the adjudication in bankruptcy was on June 22, 1939; the order of the referee was entered on October 21, 1941.

 This story of a robbery followed a well-know pattern in such cases and no sane person would believe it; if courts allowed themselves to be fobbed off with such silly tales, there would be an end to the administration of justice. In re Abesbaum, 2 Cir., 70 F.2d 628. There can be no doubt that sometime during the spring of 1939 Goldsmith stole the skins, and if the question were merely of his liability to the trustee for their value, the price at which they were sold in the preceding November might be evidence enough. But a "turnover" order does not limit itself to finding the bankrupt liable for taking the goods; it must assume in addition to find that he still has control over them and to specify what and how many they are (In re Redbord, 2 Cir., 3 F.2d 793)—a finding essential to the commitment for contempt for which the order is a foundation; and since Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419, that finding is res judicata in the contempt proceeding itself. Yet the finding is in fact seldom, if ever, true in the

case of salable goods, particularly when, as generally happens, the order is entered a year or more after the theft and at the end of a prolonged hearing. The bankrupt does not keep such goods in kind for he has no real use for them in that form, often not even when he contemplates setting up in business once more. Like other stolen goods, they are reduced to cash as soon as possible, and then nearly always at a heavy sacrifice. Moreover, the bankrupt will not keep the proceeds intact for very long; he needs ready money, and if he has stolen from his creditors, like other thieves he will enjoy the loot while he can. Whatever may be thought of the force of these considerations as demonstrating that the finding is sure to be false at least in part, we cannot conceive how anyone can believe that it is "supported" by that "clear and convincing evidence" which must exist to satisfy the test laid down in Oriel v. Russell, supra, 278 U.S. 358, 362, 49 S.Ct. 173, 174, 73 L.Ed. 419.

 Courts have recognized this difficulty, and they have usually met it by the device of a presumption, more accurately perhaps by a shift in the burden of proof. They have said that, once the trustee has shown that the bankrupt took the goods, he is "presumed" to continue in possession of them until he shows how he disposed of them, and that if, as here for example, his explanation is patently false, he still has possession of them in fact—though that is not in the least the only reasonable alternative. We cite in the margin a number of such decisions,[1] which are not, however, wholly unanimous.[2] In Danish v. Sofranski, 2 Cir., 93 F.2d 424, we tried to prick a path—not it is true guided by seamless logic, as we observed at the time—in the hope of finding something which would harmonize the decisions; but by a divided court we later overruled this attempt in Re Pinsky-Lapin & Co., 2 Cir., 98 F.2d 776, and it was better that we did. The situa-

[1] In re D. Levy & Co., 2 Cir., 142 F. 442; In re Meier, 8 Cir., 182 F. 799; Kirsner v. Taliaferro, 4 Cir., 202 F. 51, 58; Good v. Kane, 8 Cir., 211 F. 956; In re Graning, 2 Cir., 229 F. 370, Ann. Cas.1917B, 1094; In re Chavkin, 2 Cir., 249 F. 342; In re H. Magen Co., 2 Cir., 10 F.2d 91; Reiss v. Reardon, 8 Cir., 18 F.2d 200; Sarkes v. Wells, 6 Cir., 37 F.2d 339; Clements v. Coppin, 9 Cir., 72 F.2d 796; Levin v. Coleman, 3 Cir., 72 F.2d 997; In re Steinreich Associates, Inc., 2 Cir., 83 F.2d 254, certiorari de-

nied sub nom. Magurno v. O'Neil, 299 U.S. 571, 57 S.Ct. 35, 81 L.Ed. 421; In re Pinsky-Lapin Co., 2 Cir., 98 F. 2d 776.

[2] Samel v. Dodd, 5 Cir., 142 F. 68, certiorari denied 201 U.S. 646, 26 S.Ct. 761, 50 L.Ed. 903; In re Goldman, 1 Cir., 62 F.2d 421; In re Schoenberg, 2 Cir., 70 F.2d 321; In re J. L. Marks & Co., 7 Cir., 85 F.2d 392; Danish v. Sofranski, 2 Cir., 93 F.2d 424, certiorari denied 303 U.S. 641, 58 S.Ct. 610, 82 L.Ed. 1101.

tion at first blush is indeed ideal for raising a presumption or for shifting the burden of proof; the bankrupt has all the information, the trustee has none, and every consideration of justice demands that a thief should be forced to declare what he has done with the stolen goods. Nevertheless, like all such procedural devices, this one can be justified, not for its own sake, but only so far as it leads to discovery of the truth, and if it is plain that it does not do so, it is indefensible. It does not in fact lead to the truth at all, for the bankrupt's mouth is effectively closed to what would nine times out of ten be a good total, or at least a partial, defense; i. e., that he has made away with the goods. But this he cannot say, not because the law forbids, but because if he does, it leads him straight to the prison door. § 29, sub. b (1), Bankruptcy Act, 11 U.S.C.A. § 52, sub. b(1). However desirable that consummation may be, this fact makes the presumption unsuitable for its only proper purpose of eliciting the facts on whose existence the relief hangs; facts which in this situation the courts know and everyone else knows not to exist.

For these reasons, were the matter now before us as res integra, we should reverse the order. It would not disturb us that without the presumption such proceedings would generally fail, except when they were directed against specific articles like books of account. We are not persuaded that after allowances and expenses are all paid, substantial sums often reach the creditors, or indeed that the real reason for the proceeding is to collect assets at all. Its justification in the minds of both bench and bar lies rather, either in forcing a retributive payment out of the bankrupt or his family, or in merely punishing him for his theft; either alternative being thought commendable. Even if the absence of any other relief were ever an excuse for perverting legal proceedings from their avowed purpose, or for basing relief upon facts which cannot be known, other relief is here in fact available, for these offenders are extremely vulnerable and can ordinarily be successfully prosecuted, as every judge of experience knows. And though that were not so, it would be at too high a cost that the law should proceed in the face of a basic ignorance which it dares not aver and must cover by a transparent fiction; such abuse of its processes discredits it generally and impairs its integrity, which in the end depends upon an unswerving allegiance to the truth, so far as truth is accessible. Nevertheless, we do not feel justified in overruling a body of authority so nearly uniform, to the building of which we have contributed so largely. The Supreme Court has never committed itself to the presumption, and perhaps at some time may think it desirable finally to determine the question. Furthermore, we shall attempt no nice distinctions, as between an order which unconditionally directs the respondent to surrender the goods, and one which gives him the alternative of turning over their putative proceeds, fixed at their fair value when they were stolen. We can see no reason to strain at the second, if we can swallow the first; if an order is valid which rests upon a presumption that all the goods remain in kind, it should be valid, though it contains some concession to reality, even if that be loaded with its own proper charge of baseless assumption.

Order affirmed.